UNITED STATES of America, Appellee,

v.

Saul MANGUAL–CORCHADO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ernesto CIRILO–MUNOZ, a/k/a Nesty, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Luis Antonio RAMIREZ–YNOA, Defendant, Appellant.

Nos. 96–1307, 96–1308, 96–1476.

United States Court of Appeals, First Circuit.

Heard Dec. 5, 1996.

Decided March 18, 1998.

Juan E. Alvarez, with whom Lucien B. Campbell was on brief for appellant Cirilo–Munoz.

Jorge L. Arroyo–Alejandro for appellant Mangual–Corchado.

Carlos M. Sanchez La Costa for appellant Ramirez–Ynoa.

Jeanette Mercado–Rios, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Edwin O. Vazquez, Deputy Chief Criminal Division, were on brief for appellee.

Before CYR and LYNCH, Circuit Judges, and MCAULIFFE,* U.S. District Judge,

CYR, Circuit Judge.

Three youthful defendants, Saul Mangual–Corchado ("Mangual"), Luis Antonio Ramirez–Ynoa ("Ramirez") and Ernesto Cirilo–Munoz ("Cirilo"), appeal their respective convictions relating to the intentional killing of an on-duty police officer during the commis-

sion of a drug offense. *See* 21 U.S.C. § 848(e)(1)(B); 18 U.S.C. § 2. Mangual and Ramirez likewise appeal their carjacking convictions, *see id.* § 2119, and their convictions for using a firearm to commit the carjacking, *see id.* § 924(c). We affirm the district court judgments.

## I

### BACKGROUND [1]

Over an extended period of time prior to November 1, 1994, Mangual, Jose Lugo–Sanchez ("Lugo"), and David Silva worked regular nine-hour shifts selling marijuana, cocaine, and heroin seven days a week at a "drug point" immediately outside "Cafetin El Ideal" in Trujillo Alto, Puerto Rico.[2] Their mutual drug suppliers were Yito Morales and a person known only as "Chispo." Lugo correctly suspected that a particular drug customer—Ivan Mejias-Hernandez ("Mejias")—was an undercover police officer. Consequently, during late October 1994 Chispo ordered Lugo to kill Mejias. Lugo in turn promptly informed codefendant Ramirez that Mejias was to be killed on Chispo's instruction. The precise circumstances surrounding the Mejias murder are central to these appeals.

On November 1, shortly after beginning a regular shift with David Silva at the El Ideal drug point, Lugo began ingesting cocaine.[3] Between 10:00 and 11:00 a.m., Offi-

---

\* Of the District of New Hampshire, sitting by designation.

1. Viewing the evidence in the light most favorable to the government, the background facts are recounted as the jury reasonably could have found them. *See United States v. Josleyn,* 99 F.3d 1182, 1185 n. 1 (1st Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997).

2. A "cafetin" is a retail establishment which sells groceries, where customers can play pool and purchase alcoholic beverages for consumption on the premises.

3. The "drug point" itself was located immediately in front and along one side of the El Ideal building and operated around the clock, seven days a week. El Ideal is a "Mom and Pop" establishment, owned by Jose Alberto Lugo–Ramirez (no relation to either Lugo or Ramirez) and his wife, Evelyn Lugo–Delgado (no relation to Lugo). According to Jose, discarded "bag-

gies" and other drug-related litter had to be cleaned up daily by him or an employee. Jose also testified that he had seen Mejias outside El Ideal on three occasions and that Mejias had "mixed with" Mangual, Lugo and Cirilo while playing pool inside El Ideal; that Lugo, Mangual and Cirilo, whom Jose had known for about four years, were "almost always ... together," but that he had never seen Ramirez; that Cirilo, like the "other young guys," spent nine hours a day, seven days a week, at El Ideal, dividing his time about equally outside and inside El Ideal. Jose also testified to having reprimanded Lugo on one occasion for *possessing* cocaine inside El Ideal. Lugo, on the other hand, testified that both Jose and his wife had reprimanded Lugo for *selling drugs inside* El Ideal, but not when he sold them immediately outside El Ideal, even though the wife on occasion came right out next to the drug point and talked to him and his fellow drug sellers. Jose further testified that Chispo, Yito, and "Papilin," *see infra,* regularly frequented El

cer Mejias arrived in plain clothes and took a position beside the two-door, white Suzuki hatchback which he had parked in front of El Ideal. Around 11:15 a.m., Lugo called Ramirez from a pay phone located near one entrance to the El Ideal building. Lugo informed Ramirez that Mejias had arrived, then told him to bring "the gun"—with which Lugo proposed to kill Mejias—and "the car" to El Ideal. Ramirez, who had no driver's license and was just learning to drive, expressed reluctance to drive the car to El Ideal himself. Undeterred, Lugo responded simply: "I know that you can handle it."

Not later than 12:30 p.m., Ramirez arrived at El Ideal in a black Oldsmobile, with the revolver, as instructed. Cirilo arrived within ten to fifteen minutes and was greeted by Lugo. Lugo testified at trial that he said nothing to Cirilo about the impending plan to murder Mejias.

Shortly thereafter, Lugo explained to Silva that he was going across the street to the stoop of a nearby building so he could keep an eye on the El Ideal drug point in case a customer came. Officer Mejias, with Ramirez and Silva following behind him, proceeded across the street as well. Upon reaching the stoop, Lugo and Mejias immediately engaged in a heated discussion, during which Mejias proceeded to let Lugo know that he had read Lugo's lips earlier that morning when Lugo had suggested to Silva that Mejias was a police informant. Lugo, who was continuing to ingest cocaine, became very upset and said he knew Mejias was an informant.

As Silva and Ramirez neared the stoop, Lugo walked back to El Ideal, then returned to the stoop a short time later and asked Ramirez for the keys to the black Oldsmobile. After retrieving the Ramirez revolver from the black Oldsmobile in front of El Ideal, Lugo returned to the stoop and handed the Oldsmobile keys to Ramirez.

While walking back toward El Ideal a third time, with the Ramirez revolver concealed in his waistband, Lugo encountered Mangual, Cirilo, and Yito Morales (who, along with Chispo, supplied the drugs Lugo and Mangual sold at the El Ideal drug point) and attempted to "fire them up" to "prenderlo" ("beat up") Mejias. After Mangual, Cirilo and Yito failed to take up Lugo's challenge, and while all four were returning to the stoop together, Mangual offered instead to circle around behind Mejias while Lugo confronted Mejias with the Ramirez revolver so they could secure the keys to the white Suzuki in which Mejias had arrived at El Ideal, and search for his weapon.[4]

After the unarmed Mejias had been seized at gunpoint as suggested by Mangual, Lugo remained near the stoop with Mejias while Ramirez, Mangual, Yito, and Silva returned to El Ideal to search the Suzuki for the suspected Mejias weapon. Lugo testified at trial, without contradiction, that Cirilo was standing "real close" as Mangual and Ramirez retrieved the Mejias weapon from the white Suzuki. Multiple palm and fingerprints, lifted from the exterior of the Suzuki on the passenger side, were identified as belonging to Cirilo as well. Lugo then reminded Mejias that he was carrying a weapon under his shirt and walked behind him from the stoop to the Suzuki. After Mejias had retrieved the keys to the Suzuki, Lugo told him to get into the Suzuki "and not to come around there anymore."

Ideal as well. Finally, Jose expressed doubt that either Cirilo or Mangual worked, because they "were always there" (*i.e.*, at El Ideal).

Later, after testifying repeatedly on direct examination that Lugo, Mangual, and Cirilo spent roughly four hours inside and five hours outside El Ideal, Jose stated on cross-examination that he did not know whether they were *together outside* because he did not look outside. He also testified on cross-examination, however, that he had seen Mejias outside El Ideal on three occasions, *supra*, and even described exactly where the Mejias vehicle was parked on each occasion. In evaluating this conflicting evidence, of course,

we bear in mind that, as correctly instructed at trial, the jury was entitled to credit all, any or none of the testimony of each witness. *See United States v. Femia*, 57 F.3d 43, 49 (1st Cir.1995). Whereas we are required to resolve credibility choices compatibly with the verdict. *See United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994); *see also supra* note 1.

4. Given this uncontroverted evidence, the jury reasonably could infer that the reluctance of the other three to accept Lugo's earlier bidding to "beat up" Mejias had been due to their concerns that Mejias might be armed.

Just as Mejias turned on the ignition and was about to leave, however, yet another young man, who also hung around El Ideal and was identified at trial only as "Papilin," told Lugo: "You have to take him ... because he might come back."[5] Lugo thereupon abruptly instructed Mejias, at gunpoint, to get out of the driver's seat and into the back seat of the Suzuki.[6] While Mejias and Lugo entered the back seat, Mangual got into the driver's seat. As soon as the doors to the Suzuki were closed, Mangual drove the Suzuki out of the El Ideal parking area onto the highway and observed that "the others were following ... in a black Oldsmobile two-door."[7]

The Suzuki, followed by the black Oldsmobile driven by Cirilo, then proceeded easterly on the highway fronting El Ideal, past a store 50 yards distant, then through two intersections to a small valley. There, notwithstanding his pleas for mercy, Mejias was shot twice by Lugo; first in the abdomen, then in the head.[8]

---

**5.** Lugo testified, without contradiction, that "take" is street slang for "kill."

**6.** The dissent takes the position that even if we were to assume that the small group (including Cirilo) was situated "real close" to the Suzuki while it was being searched, it nevertheless must be inferred that the entire search group thereafter moved "away" from the Suzuki before Lugo ever arrived at the Suzuki with Mejias. Accordingly, the dissent argues, Cirilo must not have been near the Suzuki at the time Papilin told Lugo he had to "take" (*i.e.*, "kill") Mejias.

The position advanced by the dissent impermissibly indulges inferences unfavorable to the verdict. *See, e.g., O'Brien,* 14 F.3d at 706. First, Lugo testified, unambiguously, that *Cirilo* was "real close" to the Suzuki while Mangual and Ramirez searched it (a fact corroborated by Cirilo's fingerprints on the exterior of the Suzuki), *but that Cirilo did not participate in the search.* Second, the transcript passage cited by the dissent clearly discloses that the purport of Lugo's testimony was that the *searchers* moved away from the Suzuki after "*they* had found the weapon." Third, since Cirilo was not one of the searchers (hence, not one of the "finders") and there is *no evidence whatsoever that he left the immediate vicinity of the Suzuki* at any time after Lugo's testimony placed him "real close" to it during the search for the Mejias weapon, the *more reasonable inference* can only be that Cirilo remained "real close" to the Suzuki.

Alternatively, even if we were to *assume* that Cirilo moved away from the Suzuki, *along with the searchers,* Lugo's testimony was very clear: the searchers moved away only "a bit"; and there is no evidence whatsoever which even places *the searchers* beyond easy sight and earshot of the Suzuki. Moreover, their minimal movement from the Suzuki is further demonstrated by Lugo's testimony that Mangual—*himself one of the searchers*—was so near the Suzuki that Lugo had only to "mention [Mangual's] name" when he wanted Mangual to replace Mejias behind the wheel of the Suzuki. Finally, Papilin, who told Lugo "to take" ("kill") Mejias, must have been very close to the Suzuki; otherwise he could not have reacted so quickly to Lugo's statement moments earlier that Mejias was free to leave in the Suzuki, unharmed.

Thus, the dissent infringes on the factfinding function of the trial jury, *see id.,* in two important respects. First, it views the trial record in the light least favorable to the jury verdict. *Id.* Second, it relies on the implausible inference that Cirilo, who had shown a keen personal interest in the relevant events which unfolded earlier that morning at El Ideal (including the search of the Suzuki), inexplicably chose suddenly to depart from the scene immediately before the undercover police officer's fate was about to be decided, only to return moments later just in time to get behind the wheel of the black Oldsmobile— whose owner, Ramirez, had been extremely reluctant to drive from the outset, *see supra* p. 38— and follow the Suzuki bearing the captive police officer away from El Ideal.

**7.** This evidence came in through the FBI agent who had interviewed Mangual within a few days after these events. At that time, Mangual, who had surrendered voluntarily, admitted driving the white Suzuki away from El Ideal after Mejias had been abducted. Although Lugo testified at trial that he shot Mejias within six to ten seconds after the Suzuki left El Ideal, this same FBI agent testified that he had no recollection, nor did his later interview of Lugo reflect, that Lugo ever stated that Mejias was shot within six to ten seconds after the Suzuki left El Ideal. Thus, the jury was free to resolve this credibility matter favorably to the government. *See Josleyn,* 99 F.3d at 1185 n. 1.

**8.** The dissent states: "Lugo testified that as [Mangual, Lugo, and the captive Mejias left in the Suzuki], 'Tony [Ramirez] and Nesty [Cirilo] were *at* the El Ideal—or Cafetin Ideal.'" In this instance, the dissent accords an overly literal interpretation to Lugo's testimony by disregarding context.

First, the preposition "at," in context, is most reasonably understood to mean simply that Ramirez and Cirilo were still in the area of El Ideal where the abduction had just occurred, *since the black Oldsmobile did not depart until after the Suzuki left El Ideal.*

Second, even if Lugo's testimony could be construed to indicate that Ramirez and Cirilo moved toward or went into the cafetin—though there is

Two or three minutes after departing El Ideal, Mangual stopped the Suzuki at a school crossing, where Yito Morales, one of the drug suppliers, pulled alongside on a motorcycle. As soon as Lugo signaled that Mejias was already dead, Yito nodded and drove off. Moments later Lugo spotted the black Oldsmobile, and the Suzuki proceeded on. Once again the Oldsmobile followed, with Cirilo still at the wheel and Ramirez in the passenger seat.

A little later, after noticing that the Oldsmobile was nowhere in sight, Lugo told Mangual to double back until the Suzuki came upon the Oldsmobile, whereupon the two vehicles drove into a nearby cemetery and parked.[9] At this point in time, whether on his own initiative or on prior instruction from Yito, Ramirez asked Lugo if he was sure Mejias was dead. When Lugo said "no," Ramirez fired two shots into the victim's head, then got in the passenger seat of the Suzuki beside Mangual.

As Cirilo and Lugo led the way from the cemetery in the black Oldsmobile, Cirilo in-

gested cocaine provided by Lugo. With Mangual driving and Ramirez in the passenger seat, the Suzuki followed the black Oldsmobile to a nearby quarry. There the Suzuki—carrying the Mejias remains—was pushed over an embankment by Ramirez and Mangual, but became suspended and did not drop to the quarry floor.

After Ramirez and Mangual scurried back to the Oldsmobile, Cirilo drove them and Lugo to a successful getaway. Later, the $240 Lugo had removed from the dead officer's body before dumping the Suzuki was divided equally among them.

In due course, Mangual, Ramirez, Lugo and Cirilo were indicted for aiding and abetting the murder of an on-duty police officer during the commission of a drug offense, 21 U.S.C. § 848(e)(1);[10] 18 U.S.C. § 2;[11] carjacking, *id.* §§ 2119,[12] and using a firearm during the commission of a carjacking, *id.* § 924(c).[13]

Ultimately, Lugo entered into a plea agreement, testified for the prosecution, and received a twenty-year prison sentence. Fol-

---

*nothing* in Lugo's testimony nor in the circumstantial evidence to support such a view—the timing of any such movement would be critical as well. However, even under the sequencing advocated by the dissent, any such movement *plainly did not occur until after Papilin told Lugo that he must "kill" Mejias rather than let him leave unharmed.* By that time, of course, Cirilo's realization that Lugo intended to kill Mejias had been acquired.

9. Viewed in context, this evidence enabled the jury reasonably to infer that Lugo's obvious concerns regarding the whereabouts of the black Oldsmobile stemmed from the fact that, without it, there would be no transportation for their getaway after dumping the Suzuki. Lugo's concerns at this juncture thus mirrored the importance he had attached, earlier on, to having Ramirez deliver the Oldsmobile to El Ideal notwithstanding Ramirez's reluctance.

10. Section 848(e)(1)(B) provides:

(1) In addition to the other penalties set forth in this section—... (B) any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of this subchapter or subchapter II of this chapter who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's

official duties and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.
21 U.S.C. § 848(e)(1)(B).

11. Section 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
18 U.S.C. § 2.

12. Section 2119 provides:

Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—... (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.
18 U.S.C. § 2119(3).

13. Although Mangual and Lugo were indicted also for possessing cocaine with intent to distribute, Mangual was acquitted.

lowing a ten-day trial, the jury returned verdicts against Mangual and Ramirez on all three counts. Cirilo was acquitted of the carjacking and firearm charges, but convicted of aiding and abetting the Mejias murder. All three appellants were sentenced to life imprisonment.

## II

### DISCUSSION

A. *Motion to Dismiss Indictment (Mangual, Cirilo, Ramirez )*

■ Appellants first maintain that it was error to disallow their pretrial motion to dismiss the indictment. Relying on *United States v. Basurto,* 497 F.2d 781 (9th Cir. 1974), they argue that the indictment violated due process because the government knew it was based in material part on the testimony of Special Agent Rene F. Medina, who related to the grand jury two perjured versions of the relevant events previously provided by Lugo.[14]

After a grand juror voiced concern about Lugo's credibility, Agent Medina expressed the belief that Lugo had recognized the implausibility of his first story and decided to "come clean." However, Medina did not disclose to the grand jury that Lugo, at a later debriefing, had corrected yet other "inaccuracies" in his second version. Finally, after the grand jury returned the indictment, Lugo came forward with a third version, essentially recasting the four codefendants in the respective roles later ascribed to them by Lugo at trial.

■ Appellants maintain that (i) Lugo's prevarications, as relayed by Agent Medina, were the only competent evidence upon which the grand jury could have based its indictment, (ii) Agent Medina's "come clean" characterization of Lugo's second version

misled the grand jury into believing it was the whole truth, whereas it contained yet other "inaccuracies," and (iii) at the very least the government owed a duty under *Basurto* to return to the grand jury after Lugo had come forward with the third version.[15]

*Basurto* has been accorded mixed reviews, even by the court which decided it. *See United States v. Bracy,* 566 F.2d 649, 654–55 (9th Cir.1977), *stay denied,* 435 U.S. 1301, 98 S.Ct. 1171, 55 L.Ed.2d 489 (Rehnquist, Circuit Justice 1978) (suggesting that government's use of *grand* jury testimony which later proves to have been perjurious never implicates defendant's Fifth Amendment rights), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). For our part, we have declined to endorse *Basurto* on several occasions. *See United States v. Garcia–Rosa,* 876 F.2d 209, 232 (1st Cir.1989), *vacated on other grounds,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990); *United States v. Maceo,* 873 F.2d 1, 3 (1st Cir.1989); *United States v. Rivera–Santiago,* 872 F.2d 1073, 1088 (1st Cir.1989); *United States v. Flaherty,* 668 F.2d 566, 584 (1st Cir.1981).

Moreover, even under *Basurto* it is extremely doubtful that the variance in Lugo's descriptions of the events relayed to the grand jury by Agent Medina, however troubling, was sufficiently "material" to require *dismissal of the indictment. See Basurto,* 497 F.2d at 785. For one thing, after the unsuccessful attempt to exculpate himself in the first post-arrest interview, Lugo directly implicated Mangual, Ramirez, Cirilo, and himself, albeit even then without complete consistency in certain nonexculpatory details (*e.g.,* how Mejias and Cirilo were dressed) or the respective roles of the participants.

---

14. Initially, Lugo insisted that he was an innocent bystander who simply witnessed the abduction of Officer Mejias, and that Mangual, Ramirez, and Cirilo were the abductors. Later, Lugo admitted that he had participated, but still falsely cast himself in the comparatively passive role actually played by Cirilo, in turn miscasting Cirilo as the one who had planned the shooting, accompanied Mejias in the Suzuki, and fired the fatal shots.

15. Ordinarily, "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). We will not second-guess a refusal to dismiss an indictment unless the district court abused its discretion. *United States v. Maceo,* 873 F.2d 1, 3 (1st Cir.1989).

Furthermore, were *Basurto* thought to require a determination as to whether the grand jury would have indicted had it been fully apprised of all the inconsistent pretrial statements made by Lugo, we would have to respond in the affirmative, especially since the *petit* jury found appellants guilty beyond a reasonable doubt after an exhaustive probe into all of Lugo's prevarications, including others which occurred at trial.[16] *See Rivera–Santiago*, 872 F.2d at 1088 ("[T]his error was cured by the verdict of the petit jury, which was made aware during trial of [the government witness's] past perjury."); *see also United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994) (credibility assessments reserved for factfinder). As the trial jury found guilt beyond a reasonable doubt, we are not persuaded that a similarly informed grand jury would not have found probable cause.[17]

## B. *Motion to Replace Appointed Counsel (Ramirez )*

■ Claiming a total breakdown in the attorney-client relationship, Ramirez sought to replace court-appointed counsel three weeks before trial. He alleged that appointed counsel had refused to turn over in timely fashion documents Ramirez wished to review, refused to intervene with prison officials after Ramirez was placed in special punitive confinement, and failed to conduct an adequate investigation or to consult with Ramirez in preparing a defense.

■ As there is no absolute right to replace appointed counsel, *see United States v. Machor*, 879 F.2d 945, 952 (1st Cir.1989), we review the district court ruling for abuse of discretion only, *United States v. Richardson*, 894 F.2d 492, 496 (1st Cir.1990), after assessing, *inter alia:* (i) the timeliness of the request, (ii) the adequacy of the inquiry into the defendant's concerns, and (iii) whether the conflict between client and counsel resulted in a total lack of communication and precluded an adequate defense. *Id.* The challenged ruling was well within the district court's discretion.

The trial judge repeatedly urged Ramirez to particularize the grounds for his dissatisfaction with appointed counsel, then followed up with probing questions directed to counsel.[18] Counsel assured the court that he had explained all aspects of the case to Ramirez and that he had been prepared for trial.[19] Furthermore, Ramirez acknowledged that counsel ultimately delivered all requested documents and discussed the case with him on the five or six occasions he visited Ramirez in prison. *See, e.g., United States v. Pierce*, 60 F.3d 886, 891 (1st Cir.1995) (finding no abuse, even where lawyer-client relationship was "beset with problems," because lawyer and client were "conversing with one another"). The district court did not abuse its discretion in determining that the grounds advanced by Ramirez failed to demonstrate the requisite "total lack of communication."

---

16. Appellants point out that certain forensic evidence (*e.g.* fingerprints) was unavailable to the grand jury, and therefore that Agent Medina's description of Lugo's debriefing was even more essential to the government's case at the indictment stage. Nevertheless, even assuming the government had a duty to return to the grand jury, we would be reluctant to presume that it would not have presented essentially the same incriminating forensic evidence which supported its successful effort to convict at trial.

17. We note as well that prosecutorial efforts to mislead a grand jury into returning an indictment normally may be addressed by more measured means. *See Rivera–Santiago*, 872 F.2d at 1088 (noting that " 'the sanction . . . of dismissing an indictment after a defendant has been convicted of an offense is employed in only truly extreme cases of egregious prosecutorial conduct' ") (citation omitted).

18. Since the district court did not discuss the matter, we shall assume that the Ramirez motion was not late. We note, nonetheless, that Ramirez failed to act until three weeks before trial, even though he claimed that counsel had kept him waiting five or six *months* for certain *unspecified* documents. *See Richardson*, 894 F.2d at 496 (noting that replacement counsel should not be appointed if it would "unduly hinder the fair, efficient and orderly administration of justice").

19. As for appointed counsel's failure to intercede when Ramirez was placed in special punitive detention, Ramirez does not deny engaging in sanctionable prison conduct. Moreover, he concedes that he was housed with other inmates; that is, neither in solitary nor other extraordinary punitive confinement. Thus, he has not competently indicated how intercession by counsel could have ameliorated the situation.

## C. Sufficiency of the Evidence (Ramirez)[20]

 Ramirez claims that the government adduced insufficient evidence to establish, beyond a reasonable doubt, all elements of the three charged offenses. *See supra* notes 10–12. He relies primarily on the contention that the trial testimony provided by Lugo was crucial to his conviction and that Lugo demonstrated conclusively that he is an inveterate liar.[21]

 Although fully informed of Lugo's prevarications, as well as the generous terms of his plea agreement with the government, the verdicts substantiate that the jury none-. theless credited Lugo's trial testimony at least in part. Lugo testified that he promptly informed Ramirez, his friend since childhood, that Chispo had ordered Lugo to kill Mejias, and that Ramirez later complied with Lugo's November 1 telephonic instruction to deliver the revolver and the black Oldsmobile to El Ideal. *See United States v. Fountain,* 768 F.2d 790, 798, *modified on other grounds,* 777 F.2d 345 (7th Cir.1985). Moreover, the El Ideal owner on duty the morning of November 1 testified that she overheard the phone conversation Lugo had with Ramirez, during which Lugo talked about killing "the guy" (*i.e.,* Officer Mejias). In addition, a search of the Ramirez residence disclosed incriminating circumstantial evidence corroborating Ramirez' close association with Lugo and his ready access to weapons.[22] Nor did any other trial evidence, *see, e.g., supra* note 21, constrain the jury to reject Lugo's corroborated testimony that Ramirez intentionally participated in the charged offenses, *see supra* note 20.[23]

20. We examine the district court ruling under Fed.R.Crim.P. 29 to determine whether the evidence and reasonable inferences, *viewed as a whole and in the light most favorable to the government,* would enable a rational jury to conclude, beyond a reasonable doubt, that Ramirez was guilty of each offense. *See United States v. Sullivan,* 85 F.3d 743, 747 (1st Cir.1996) (emphasis added). In addition, we must defer to the jury regarding all credibility assessments. *See, e.g., O'Brien,* 14 F.3d at 706.

21. Ramirez correctly notes that both El Ideal Cafetin owners testified that they could not remember ever seeing Ramirez prior to trial. The record likewise reflects that Lugo never identified Ramirez as a drug dealer and that though fingerprints belonging to Mangual, Cirilo, and Lugo were found in or on the white Suzuki, no Ramirez prints were found.

22. Ramirez challenges the admission in evidence of several items lawfully seized from his residence, including, *inter alia,* a notebook with the entry "Joselito mi socio"—"Joselito" being Lugo's nickname and "mi socio" meaning "my partner." He argues that the government introduced the notebook only to show bad character or criminal "propensity," *see* Fed.R.Evid. 404(b), that the evidence had no special relevance under Rule 404(b), and that any relevance was outweighed by the risk of unfair prejudice, *see id.* 403. We review Rule 403 and 404(b) rulings for abuse of discretion only. *See United States v. Trenkler,* 61 F.3d 45, 52 (1st Cir.1995). We find none.

The notebook entry tended to corroborate Lugo's testimony that Ramirez had the requisite foreknowledge of Chispo's order to kill Officer Mejias and that Ramirez had in fact provided his "socio" [partner], Lugo, with a weapon on November 1, 1994, with intent to aid and abet Lugo in the Mejias murder. *See United States v. Figueroa,* 976 F.2d 1446, 1454 (1st Cir.1992) (Rule 404(b) may permit introduction of evidence for purely corroborative purposes on matters "significant to the prosecution's case"); *cf. United States v. Tejada,* 886 F.2d 483, 487 (1st Cir.1989) (Rule 404(b) deals only with "*other* bad acts," so that "[e]vidence of the crime charged does not need to fall within the exceptions to Rule 404(b) to be admissible.").

23. Ramirez further contends that the district court improperly restricted his right to cross-examine Lugo concerning a prior juvenile adjudication. In addition to establishing the bare existence of the juvenile adjudication, Ramirez sought to elicit an admission that Lugo had testified falsely against his juvenile cohorts in order to obtain a lesser sentence, thereby further undermining Lugo's credibility in regard to his cooperation agreement with the government in *this* case. We review for "abuse of discretion" only. *See United States v. Meyers,* 952 F.2d 914, 916 (6th Cir.1992); *United States v. Kindred,* 931 F.2d 609, 612 (9th Cir.1991).

Rule 609 expressly renders evidence of a witness's prior juvenile adjudication presumptively inadmissible unless the trial court "is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." *See* Fed.R.Evid. 609. As Lugo had already admitted to a litany of fabrications and acknowledged his generous plea agreement with the government, the district court supportably determined that the proposed cross-examination would be cumulative and minimally probative. *See, e.g., United States v. Williams,* 963 F.2d 1337, 1341 (10th Cir.1992) ("In view of the opportunity for cross-examination ..., it was not an abuse of discretion for the judge to exclude evidence of the alleged juvenile adjudications.").

### D. Sufficiency of the Evidence (Cirilo)

#### 1. Applicable Law

 The government was required to prove beyond a reasonable doubt that Mejias was murdered by Lugo, the alleged principal, and that Cirilo "consciously shared" Lugo's criminal design, associated himself with it, and actively sought to ensure its success. *See United States v. Spinney*, 65 F.3d 231, 235 (1st Cir.1995); *see also United States v. Ruiz*, 105 F.3d 1492, 1499 (1st Cir.1997); *United States v. Loder*, 23 F.3d 586, 591 (1st Cir.1994); *United States v. Francomano*, 554 F.2d 483, 486–87 (1st Cir.1977). Thus, in the present case the specific-intent element for aiding and abetting a violation of 21 U.S.C. § 848(e)(1)(B) required proof beyond a reasonable doubt that Cirilo, *before the murder occurred*, consciously shared Lugo's intention to kill Mejias and sought to ensure the success of the criminal enterprise by operating the black Oldsmobile used to effect the getaway after the Suzuki had been dumped. *See Spinney*, 65 F.3d at 235; *United States v. de la Cruz–Paulino*, 61 F.3d 986, 998–1000 (1st Cir.1995). Even assuming, *arguendo*, that Cirilo's actions *after* the Mejias murder are insufficient to establish his *foreknowledge*, *see United States v. Andrews*, 75 F.3d 552, 557 n. 5 (9th Cir.), *cert. denied*, 517 U.S. 1239, 116 S.Ct. 1890, 135 L.Ed.2d 183 (1996), those actions may provide support for a reasonable inference regarding his foreknowledge.

#### 2. Standard of Review

 We review *de novo* the district court's determination that the jury reasonably found "each *element* of the crime to have been proven beyond a reasonable doubt...." *United States v. Houlihan*, 92 F.3d 1271, 1295 (1st Cir.1996) (reversing conviction for aiding and abetting murder) (emphasis added), *cert. denied*, —— U.S. ——, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997). We must consider the evidence as a whole, together with all rational inferences therefrom, in the light most favorable to the government. *Loder*, 23 F.3d at 589; *United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir. 1991). Where *de novo* review discloses that *essential* jury findings on knowledge or specific intent were purely speculative, an aiding and abetting conviction cannot stand. *See, e.g., Houlihan*, 92 F.3d at 1295; *Spinney*, 65 F.3d at 235 (reversing conviction for aiding and abetting use or carrying of firearm by principal during crime of violence); *de la Cruz–Paulino*, 61 F.3d at 1002 (vacating conviction for aiding and abetting possession of cocaine with intent to distribute).

 As in any case, of course, " '[w]e defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in the circumstances revealed by the evidence.' " *United States v. Guerrero*, 114 F.3d 332, 339 (1st Cir.1997) (quoting *United States v. Passos–Paternina*, 918 F.2d 979, 985 (1st Cir.1990)). Furthermore, the jury is entitled to rely on a chain of reasonable inferences, as long as each constituent inference is rooted in the evidence. *See Spinney*, 65 F.3d at 237–38. Finally, it is important to point out that though the "beyond-reasonable-doubt burden applies to 'every element' of each offense charged[,][it] *neither* [applies] *to all the subsidiary inferences* nor to 'every hypothesis consistent with the defendant's innocence.' " *United States v. Roberts*, 119 F.3d 1006, 1017 (1st Cir.1997) (quoting *Spinney*, 65 F.3d at 234) (emphasis added).

#### 3. Mere Presence and Association

Cirilo essentially maintains that his proven participation—in operating the getaway vehicle, disposing of Mejias' body, and sharing the "spoils" removed from it—though arguably adequate to demonstrate that he was an accessory after the fact, *see* 18 U.S.C. § 3, did not establish the requisite *preexistent* intent to aid and abet the Mejias murder. *See* 21 U.S.C. § 848(e)(1)(B); 18 U.S.C. § 2; *supra* notes 10 & 11. Thus, Cirilo correctly contends that something more than "mere presence" and "mere association" is required, *see, e.g., United States v. Montilla–Rivera*, 115 F.3d 1060, 1064 (1st Cir.1997); that is to say, the evidence, direct and circumstantial, must establish beyond a reasonable doubt that he not only associated himself in some manner with the Mejias murder, as the evidence plainly shows, *see infra* Section II.D.4, but that he did so *after* acquiring the requi-

site knowledge that Lugo intended to kill Mejias.

■ For its part, the government relies first and foremost on Cirilo's presence throughout virtually the entire period immediately preceding and including the capture and abduction of Officer Mejias, Cirilo's longstanding association with Lugo and Mangual, and his direct involvement in the events which unfolded from the time the white Suzuki departed the El Ideal premises carrying Lugo, Mangual and Mejias. *See, e.g., United States v. Luciano–Mosquera,* 63 F.3d 1142, 1150 (1st Cir.1995) ("mere association" defense), *cert. denied,* 517 U.S. 1234, 116 S.Ct. 1879, 135 L.Ed.2d 174 (1996); *Batista–Polanco,* 927 F.2d at 18 ("mere presence" defense).[24]

#### 4. *Evidence of Foreknowledge*

■ Cirilo allows that the government may have adduced sufficient evidence that he knew Lugo intended to "beat up" Officer Mejias, but argues that it adduced no direct evidence that he knew, *at any time,* that Lugo intended to *murder* Mejias. We note as well that any jury finding regarding Cirilo's foreknowledge and intent could not have been predicated on his lack of credibility, since Cirilo did not testify. Nor did any witness testify that Cirilo had been told of Lugo's lethal intentions before Mejias was abducted in the Suzuki, nor that Cirilo ever admitted knowing that Lugo harbored such

intentions. *See, e.g., Loder,* 23 F.3d at 592 (rejecting, as "too weak," an inference that because defendant helped principal dismantle car, principal had communicated to defendant that purpose of dismantling was to facilitate an insurance fraud by the car owner, absent any evidence that defendant had been informed of the scheme, or that defendant ever mentioned the scheme). Instead, Cirilo points out, Lugo—the chief prosecution witness and, at least arguably, the person most likely to have informed Cirilo of the murder plan—testified without contradiction that Cirilo was completely in the dark about the murder plan on November 1. *Cf. Houlihan,* 92 F.3d at 1294–95.

■ The prosecution need not adduce direct evidence, of course, but may rely entirely on circumstantial evidence to establish beyond a reasonable doubt each element of the crime charged, *see United States v. Valerio,* 48 F.3d 58, 63 (1st Cir.1995); *United States v. Akinola,* 985 F.2d 1105, 1109 (1st Cir.1993), including the alleged aider and abettor's foreknowledge, *see Spinney,* 65 F.3d at 235; *de la Cruz–Paulino,* 61 F.3d at 999 n. 9; *United States v. Taylor,* 54 F.3d 967, 975 (1st Cir.1995); *Loder,* 23 F.3d at 592. In other words, "the criminal law does not place a special premium on direct evidence," *O'Brien,* 14 F.3d at 706, and a defendant's intent may be inferred from the circumstances and the actions of the defendant. *See Valerio,* 48 F.3d at 63. Moreover, where

---

**24.** As we have observed, "the line that separates mere presence from culpable presence is a thin one, often difficult to plot." *United States v. Ortiz,* 966 F.2d 707, 712 (1st Cir.1992). It is thus incumbent upon the government to plot the elusive line as clearly as the evidence fairly allows. *Cf. de la Cruz–Paulino,* 61 F.3d at 999 n. 10 (admonishing government for cursory discussion of sufficiency challenge to aiding-and-abetting conviction, and noting that "[d]espite the prosecution-friendly overtones of the standard of review, [the government should not treat] appellate oversight of sufficiency challenges [as] ... an empty ritual") (citing *Ortiz,* 966 F.2d at 711–12). Nevertheless, the government's brief on appeal devotes but five pages to the sufficiency challenges raised by both Cirilo *and* Ramirez, focusing almost exclusively on Cirilo's conduct *following* the murder.

At oral argument, moreover, government counsel was asked to identify the circumstantial evidence from which the jury reasonably could have

inferred that Cirilo knew beforehand that Lugo intended to murder Mejias. After explaining that the pertinent record citations had been misplaced, government counsel indicated that the court would be provided with them. None were provided.

Although it should not be necessary to remind government counsel that due diligence is required in all cases before this court, certainly not least in criminal cases involving life imprisonment, the government's dereliction does not relieve the court of its independent responsibility to review, *de novo,* the sufficiency of the evidence on each element of the crime charged. *See Houlihan,* 92 F.3d at 1295. Accordingly, we have scrutinized the entire record to determine whether the evidence, viewed in the light most compatible with the verdict, *see supra* note 20, enabled a rational jury inference that Cirilo knew, before the fatal shot was fired, that Lugo intended to kill Mejias.

the evidence as a whole is sufficient to support the verdict, the government "need not rule out every other reasonable hypothesis of innocence." *O'Brien,* 14 F.3d at 706.

A network of record facts, *see supra* note 3, prominently supported a rational inference that the longstanding association among Lugo, Mangual and Cirilo at El Ideal was neither entirely casual nor exclusively social. In the first place, the evidence plainly disclosed that Chispo (along with Yito Morales) supplied the drugs Lugo and Mangual—Cirilo's constant companions at El Ideal—sold at the· El Ideal drug point. Furthermore, at trial Lugo was asked about a post-arrest FBI debriefing in which he falsely cast Cirilo as the principal planner and triggerman in the Mejias murder. At that time Lugo had informed the FBI that Cirilo committed the murder to pay off an outstanding drug debt due Chispo, the same person who ordered Lugo to kill Mejias. Although Lugo later disavowed the earlier FBI debriefing as a partial fabrication as concerned the identity of the actual killer, *see generally supra* Section II.A, he nevertheless testified at trial that Cirilo did indeed owe Chispo money, without identifying the amount or nature of the obligation. Moreover, there was neither evidence nor argument that Chispo was engaged in any *other* business, activity or endeavor which would account for the debt owed him by Cirilo.

In all events, given Ramirez' demonstrated reluctance even to drive the getaway car *to El Ideal,* not to mention the inherent risk in relying upon an inexperienced, unlicensed driver for so dangerous and important a responsibility in these stressful circumstances, we think the suggested inference of *mere* presence and association is not only counterintuitive, but considerably less plausible than

the inference that Cirilo was there to drive the Ramirez automobile, as corroborated by, *inter alia,* the ready acceptance accorded him among the three other defendants from the time he arrived at El Ideal, including most of the pre-capture period and throughout the capture and abduction. *See, e.g., Montilla–Rivera,* 115 F.3d at 1064 ("Criminal conspirators do not often 'welcome innocent nonparticipants as witnesses to their crimes.'"); *Batista–Polanco,* 927 F.2d at 18 ("[T]he factfinder may fairly infer ... that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes.").[25] Moreover, immediately after the doors of the Suzuki were closed Cirilo got into the driver's seat of the Ramirez Oldsmobile and followed behind the Suzuki, which was carrying Lugo, Mangual and the suspected police officer whom Cirilo had just seen captured and abducted at gunpoint moments after having been told he could leave unharmed. *See supra* Section I.

In our view, therefore, the evidence supported a rational jury inference that Cirilo, who was indebted to the same drug supplier who ordered Lugo to murder Mejias, did not appear at El Ideal by mere happenstance minutes after the getaway vehicle and the murder weapon were delivered by Ramirez; nor by odd coincidence innocently associate thereafter in the high-stakes criminal enterprise of capturing, abducting, and carjacking a suspected police officer. *See Guerrero,* 114 F.3d at 343 ("Although these facts, *in isolation,* do not necessarily lead to the conclusion that the [defendants] *knew ...,* *in combination* [ ] they constitute more than enough evidence to support a finding of positive knowledge ....") (emphasis added).[26]

---

**25.** The jury reasonably could infer as well that the decision to dump the Suzuki had not been spontaneous, especially given the greatly heightened risk of apprehension and prosecution were it discovered intact, with the body of the murdered officer. The evidence also enabled a fair finding that Mangual had pumped the accelerator just before pushing the Suzuki over the embankment at the quarry, in order to flood the engine and increase the likelihood that the Suzuki would ignite and burn after going over the embankment. As already noted, of course, the Suzuki instead became suspended and remained

intact, *see supra* Section I, a fortuity but for which these defendants might never have been convicted.

**26.** We note also that Cirilo's reliance on Lugo's trial testimony—that Cirilo did not know of Lugo's lethal intentions when Cirilo first arrived at El Ideal on the day of the murder—is not conclusive, for several reasons. Most importantly, Lugo was not competent to testify to what Cirilo may have learned from anyone but Lugo, or through Cirilo's personal observation and deduction after arriving at El Ideal. *See infra* note

For his part, Cirilo proposes no reasoned argumentation which would preclude a rational jury—employing its experience, reason, common sense, and understanding of human behavior, *see, e.g., id.* at 339—from inferring that the three other defendants would not have welcomed him in their immediate presence during the capture, carjacking, and abduction of Officer Mejias, unless it were well understood among them that Cirilo shared their knowledge and criminal intent. *See Batista–Polanco*, 927 F.2d at 18. Instead, ignoring the incriminating circumstantial evidence, or according it *piecemeal* attention, *but see O'Brien*, 14 F.3d at 707, Cirilo focuses on the direct evidence which comports with his mere presence and association; principally, Lugo's testimony that Cirilo had not been told, and did not know, Mejias was to be killed, but only that he was to be assaulted.

We address this contention against the backdrop of the entire record, viewed favorably to the government, to determine whether the aiding and abetting verdict was adequately supported. *See, e.g., Guerrero*, 114 F.3d at 339; *O'Brien*, 14 F.3d at 707. No direct evidence enabled a finding that Cirilo knew, prior to his arrival at El Ideal on November 1, that Lugo intended to harm Officer Mejias in any way. Moreover, Lugo testified without contradiction that he never told Cirilo that Mejias was to be killed, but merely urged that Cirilo, *inter alios*, "beat up" Mejias.[27]

We conclude nonetheless that the evidence afforded adequate support for a reasonable jury inference that Cirilo acquired the requisite knowledge in the course of the riveting events that transpired in his immediate presence, from the time Lugo attempted unsuccessfully to incite Ramirez, Mangual and Cirilo to beat up Officer Mejias, *see supra* Section I, through the point in time when Lugo's flagrant actions—as Mejias was about to leave unharmed in the white Suzuki—made it unmistakably clear that Lugo was not going to release Mejias at all. We trace these constituent inferences step by step. *See Spinney*, 65 F.3d at 234.[28]

Lugo's uncontroverted testimony, together with the four Cirilo prints lifted from the hood of the Suzuki itself, were sufficient to establish, beyond a reasonable doubt, that Cirilo was standing "real close" to the Suzuki as Mangual and Ramirez searched for the

27. In addition, of course, the jury was free to discredit any part of Lugo's testimony. *See Femia*, 57 F.3d at 49 ("Matters of credibility are for the jury and it may believe some portions of a witness's testimony and disbelieve others.")

**27.** While the jury was free to reject any trial testimony for credibility reasons, *Femia*, 57 F.3d at 49, we shall assume, *arguendo*, that it accepted Lugo's testimony in this regard, in order that we may evaluate whether the circumstantial evidence *alone* permitted a rational jury inference that Cirilo, *after arriving at El Ideal on November 1 but before the murder*, acquired the requisite conscious knowledge that Lugo intended to kill Mejias. The noteworthy evidence thus bypassed under this approach includes that previously related, *see, e.g., supra* note 3; the evidence that Cirilo owed money to Chispo, who ordered Lugo to kill Mejias and "co-owned" the El Ideal drug point where Lugo and Mangual *et al.* sold drugs daily; and the evidence that the drug point was right next to the El Ideal building, where Cirilo spent approximately nine hours a day, seven days a week in the company of Lugo and Mangual, *inter alios*.

Nevertheless, we do not assume in the process that Lugo was *competent* to testify to the actual knowledge Cirilo may have acquired by virtue of his immediate presence during most of the events that transpired at El Ideal just before and during the abduction of Mejias in the Suzuki on November 1. Nor are we at liberty to disregard the important factfinding insights this circumstantial matrix afforded regarding the events that took place after Cirilo arrived at El Ideal on November 1. *See Spinney*, 65 F.3d at 237–38. Finally, it must be noted that no competing rationale, particularly Cirilo's mere "innocent bystander" defense, as adequately accounts for his immediate presence and association among the other defendants throughout the Mejias capture and abduction, especially in light of his usefulness to their criminal enterprise as the driver of the getaway vehicle.

**28.** We recognize, of course, that the verdict may not stand unless the evidence as a whole, *see O'Brien*, 14 F.3d at 707, including the telltale developments Cirilo witnessed right next to the Suzuki during the forcible abduction itself, afforded adequate support for a rational jury inference that Cirilo, by then at least, realized that Lugo intended to *kill* Mejias rather than merely beat him up. *See Ortiz*, 966 F.2d at 711. Our function, however, is simply to determine whether such an inference rationally flowed from the evidence; the factfinding function was for the jury. *See O'Brien*, 14 F.3d at 707.

Mejias weapon at Lugo's direction. *See supra* Section I. Moreover, *there was no evidence and no contention that Cirilo departed from the immediate vicinity of the Suzuki until it exited the El Ideal parking area immediately after Mejias was abducted by Lugo,* at which point Cirilo, without hesitation, got into the driver's seat of the Ramirez Oldsmobile and followed the Suzuki onto the highway fronting El Ideal.

Consequently, the jury reasonably could find that Cirilo witnessed the events which took place at this critical juncture: first, as Lugo suddenly ordered Officer Mejias to get into the *driver's* seat of the Suzuki "and not come around there anymore;" then, moments later, as Lugo—in an abrupt about-face following immediately on the heels of the Papilin warning to "take" ("kill") Mejias "because he might come back"—ordered Mejias at gunpoint *to get out of the front seat and into the back seat* of the Suzuki. *See supra* note 5. Whether the jury considered Papilin merely the messenger or something more, at that point it reasonably could conclude that the *message itself—that Mejias was not going to be released after he had been abducted—* hardly could have gone unheeded by Cirilo. *See Spinney,* 65 F.3d at 237 ("Jurors are 'not expected to ignore what is perfectly obvious,' but, rather, 'to take full advantage of their collective experience and common sense.'") (citations omitted). Finally, after Lugo got into the Suzuki beside Mejias, revolver in hand, Mangual replaced Mejias in the driver's seat. Whereupon Cirilo in turn promptly got behind the wheel of the Ramirez Oldsmobile and followed the Suzuki onto the highway.

Even assuming Cirilo had not become consciously involved earlier, the jury therefore reasonably could have found that what transpired in his immediate presence, before the Suzuki departed El Ideal, undermined any inference of *innocent participation thereaf-*

ter, particularly in light of Cirilo's unchallenged presence among the other defendants throughout almost the entire pre-capture period and his unhesitating aid to their criminal enterprise during the post-abduction and post-murder stages.[29] *See, e.g., Batista–Polanco,* 927 F.2d at 18 ("'understanding of human behavior' may ground reasonable inference from circumstantial evidence").

For these reasons, therefore, we hold that the jury rationally could infer that Cirilo, *at least by then,* possessed the requisite conscious knowledge that Lugo intended to kill Mejias in order to make certain that he could not come back, as Papilin had forewarned in Cirilo's immediate presence; and further that immediately thereafter—as plainly evidenced by his affirmative conduct—Cirilo shared and sought to facilitate Lugo's criminal purpose by driving the getaway vehicle.

Although the foregoing analysis is substantiated by various subsidiary inferences as well, the most telling evidence was Lugo's sudden, about-face decision *not* to release Mejias, which indicated unmistakably that he had heeded the Papilin warning that the defendants, *inter alios,* would be exposed to a greatly increased risk of apprehension, prosecution and punishment were Mejias to be released after having been abducted, carjacked and assaulted at gunpoint. Viewed in context, Lugo's decision—that Mejias was *not going to be released after all*—severely undercut any inference that Cirilo was not consciously aware, from that moment on at least, that Lugo intended to ensure that Mejias not "come back" as Papilin had advised. Notwithstanding the rapidity of the ensuing events, therefore, the flagrant developments witnessed by Cirilo immediately before the Suzuki left El Ideal plainly permitted a reasonable inference that—by then, if not sooner—Cirilo had (i) acquired the conscious knowledge that Mejias was to be killed and

---

**29.** Cirilo argues that it could not reasonably be inferred that he saw Lugo hold the Ramirez revolver on Mejias shortly before the Suzuki left El Ideal, since the government presented no eyewitness testimony. As we have explained, however, circumstantial evidence may suffice, *see Loder,* 23 F.3d at 589, and it required no leap of faith to infer that even an innocent onlooker reasonably could be expected to take the occa-

sion afforded by a clear view to observe whether the abductor was holding a gun on a police officer about to be carjacked and abducted in his immediate presence. *See, e.g., Sullivan,* 85 F.3d at 747 (in considering challenge to sufficiency of evidence, appellate court views evidence in light most favorable to verdict); *Batista–Polanco,* 927 F.2d at 18.

(ii) formulated the requisite intent to aid and abet the murder by following the Suzuki in the Ramirez Oldsmobile, thereby ensuring his criminal associates their only means of effecting a safe getaway.

Accordingly, we conclude that the uncontroverted evidence that Cirilo was present earlier, when Lugo tried to incite him, Mangual, and Ramirez to assault Mejias, undermined any inference that Cirilo, from that time forward, remained a *mere* bystander innocently caught up in a secret plot among his longtime associates to assault and abduct a suspected police informant. Furthermore, the uncontroverted evidence that Cirilo also was present later—as Lugo instructed Mejias to leave and not return, then countermanded that instruction in direct response to Papilin's warning that Mejias had to be killed "because he might come back"—eroded any rational inference that Cirilo's operation of the getaway vehicle thereafter was undertaken without the requisite foreknowledge and shared intention to facilitate the Mejias murder.

## III

### *CONCLUSION*

The district court judgments are *affirmed.*

McAULIFFE, District Judge (dissenting in part).

Lugo's cold-blooded murder of Officer Mejias was as horrible a crime as can be committed. On that point all can agree. If the horrible nature of the murder added some weight to the record evidence supporting the aiding and abetting charge against Cirilo, then I would gladly join my colleagues in affirming his conviction. But it does not.

If appellate review of the sufficiency of trial evidence to support a criminal conviction *beyond a reasonable doubt, as a matter of law,* means anything, then in my view we cannot affirm Cirilo's aiding and abetting conviction. The record evidence does not support that charge by a preponderance; it does not clearly and convincingly support that charge; and it is certainly not sufficient

to prove beyond a reasonable doubt that Cirilo aided and abetted Lugo's murder of a police officer.

The majority's analysis of Cirilo's sufficiency claim is quite thorough, and I have no doubt whatsoever that my colleagues are as sincerely convinced that they are right as I am convinced they are wrong. Nevertheless, because the majority opinion, in my view, tells a tale that the record does not support, and a tale not plausible in light of the facts as I read them, I am compelled, respectfully, to register my dissent to that part of the opinion affirming Cirilo's conviction. In every other respect, I join in the majority opinion.

Like his codefendants, Cirilo was charged with carjacking, use of a firearm in the commission of carjacking, and aiding and abetting the murder of an on-duty police officer while committing a drug offense. Unlike his codefendants, Cirilo was convicted only of the aiding and abetting charge. The fundamental problem with Cirilo's conviction seems plain to me. The prosecutor charged Cirilo with aiding and abetting, which she could not prove, and failed to charge him with the crime she probably did prove, accessory after the fact.

Under similar circumstances, the Court of Appeals for the District of Columbia Circuit properly cautioned that "[t]he sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged." *United States v. Salamanca,* 990 F.2d 629, 638 (D.C.Cir.1993). The risk, our sister circuit recognized, is that the jury will convict the defendant of a charged crime, despite insufficient evidence, to avoid letting a defendant they believe to be guilty of a different, uncharged, offense escape punishment. *Id.* That is precisely what happened here in my judgment.

In my view, this court should not try to save the government's case against Cirilo by reading speculative assumptions into the record and knitting theories about Cirilo's premurder participation from those speculative threads.[30] We should be particularly cau-

---

**30.** I acknowledge that the record may be the

greatest challenge in assessing the sufficiency of

tious here, where the government's case is completely contradicted by its chief cooperating witness, Lugo, the acknowledged murderer, who testified unequivocally that Cirilo had no advance knowledge about his plan to murder Mejias and did not assist him in committing the murder in any way.[31]

Appellate review of the legal sufficiency of evidence to support a guilty verdict involves two steps: first, the court must properly credit and interpret the record evidence; second, the court must decide whether, as a matter of law, the evidence, properly assessed and taken as a whole, would permit a rational jury to find each element of the charged crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Fulmer*, 108 F.3d 1486, 1490 (1st Cir.1997); *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994). At the first step, the court considers both the direct and circumstantial evidence in the record, viewing all the evidence and resolving all reasonable inferences and credibility issues in favor of the government's theory of guilt. *See United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995).

At the second step, we must determine whether, as a matter of law, a rational jury could have found, beyond a reasonable doubt, all of the elements of the aiding and abetting charge. That is, whether Cirilo knew in advance that Lugo planned to kill Officer Mejias, and associated himself with and participated in Lugo's murder plan "as some-

thing he wished to bring about, and sought by his actions to make ... succeed." *United States v. Montilla–Rivera*, 115 F.3d 1060, 1064 (1st Cir.1997).

Lugo shot and murdered Officer Mejias. There is no dispute about that. As frequently happens under the Sentencing Guidelines, the murderer cut a favorable deal (twenty years) and became the government's chief cooperating witness at the trial of those he implicated. But Lugo testified repeatedly and without contradiction that Cirilo knew nothing about his plan to kill Officer Mejias before he carried it out.[32] No one else testified differently, and no direct evidence supported the notion that Cirilo knew, beforehand, about Lugo's intent to murder, and decided, in advance, to assist, and then actually assisted Lugo.

The government's case against Cirilo, such as it was, necessarily relied entirely on inferences to be extracted from circumstantial evidence. While a verdict may properly be based on circumstantial evidence, and all theories of innocence need not be ruled out, *United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir.1991), inferences that are unreasonable, unsupportable, or speculative cannot be considered in assessing evidentiary sufficiency, *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir.1995).

The majority suggests that the jury could easily have inferred that Cirilo must have known that Lugo was going to kill Officer Mejias, and that Cirilo followed in the Oldsmobile with Ramirez (when Mejias was ab-

---

the evidence in this case. The apparent translation difficulties combined with the lack of a consistent, logical presentation of the events involved in the charged crimes pose significant impediments to our analysis. Nevertheless, the record as a whole tells a story that is contrary to the inferences the majority has drawn.

**31.** It should not go unnoticed that the government has never made the evidentiary argument that the majority makes so well. Even though specifically questioned at oral argument about the apparently weak evidence of Cirilo's guilt of aiding and abetting, and even though given an opportunity to provide supplemental briefing, with specific record citations to support its sufficiency argument, the government did not do so. The majority attributes the government's failure to a lack of diligence. I think the government's

silence is better explained as an eloquent concession that the record evidence is indeed insufficient to support Cirilo's conviction. The government no doubt reviewed the record and decided it had nothing to say that could be helpful.

**32.** I don't disagree with the majority's point that Lugo's testimony only reflects his (Lugo's) understanding of what Cirilo knew about his intent to kill Mejias, and not necessarily what Cirilo actually knew from some other source, or from his own observations. However, even if the jury disbelieved Lugo's testimony about Cirilo's noninvolvement, that disbelief is not evidence that Cirilo *was* involved, nor would it provide even a basis for an inference that Cirilo *did* know of Lugo's murder plan beforehand. Such an inference must be based on some actual evidence, direct or circumstantial, and there is none.

ducted and driven away in the Suzuki) in order to assist Lugo—by providing a getaway car for use after Lugo murdered the officer. The record does not, in my view, support any of those inferences, and I do not agree that the inferences coaxed from the record by the majority to establish the elements of aiding and abetting are even plausible. But, if one does accept the majority's inferential analysis, the same inferences more persuasively, or at least equally persuasively, support Cirilo's innocence, as I discuss later.

*The Record Evidence of Aiding and Abetting*

"Criminal intent is an important element of aiding and abetting," and "[p]roof of this element *demands* a showing that the defendant *consciously shared* the principal's *knowledge* of the underlying criminal act, and *intended* to help the principal." *United States v. Taylor,* 54 F.3d 967, 975 (1st Cir. 1995) (emphasis added). The state of mind required by the specific intent element of aiding and abetting is the same as that required to prove the principal offense. *United States v. Loder,* 23 F.3d 586, 591 (1st Cir.1994). The underlying offense charged in this case was a violation of 21 U.S.C.A. § 848(e)(1)(B), which imposes penalties on one who during the commission of a drug offense "intentionally kills" a law enforcement officer while on duty. Timing is also critical. To be guilty of aiding and abetting, a defendant must know, in advance, that the crime will take place, and must choose, ahead of time, to assist in its commission (since a defendant cannot be found guilty of aiding and abetting a crime that has already occurred). *Salamanca,* 990 F.2d at 638–39.

The majority finds proof of Cirilo's advance knowledge of, and specific intent to assist in Lugo's plan to kill Mejias from the following combination of circumstances: 1) Cirilo and Lugo both owed debts to a drug dealer named Chispo,[33] and Chispo ordered Lugo to kill Officer Mejias; 2) Cirilo, a drug user, regularly associated with Mangual and Lugo, also drug users, at El Ideal; 3) Cirilo

appeared at El Ideal on November 1 only ten or fifteen minutes after Ramirez arrived; 4) although Ramirez drove the Oldsmobile to El Ideal, he was not a competent driver; and 5) Cirilo drove Ramirez's car when he and Ramirez followed Officer Mejias's car. Given those circumstances, the majority recognizes a "network" that leads to "the inference that Cirilo *was there* [at El Ideal] *to drive the Ramirez automobile*" and that he *knew* of the murder plan. (Emphasis added.)

No such "network" is apparent to me. Instead, the majority's inferences seem to be based on little more than an unsupported assumption that a detailed preexisting plan to kill Officer Mejias must have existed among these drug-using teenagers, just because Lugo killed him and Cirilo was hanging around. The undisputed evidence actually shows that well before the day Lugo shot and killed Mejias, he had been under orders from his drug supplier, "Chispo," to kill the officer. Nevertheless, Lugo arrived at El Ideal on November 1 with no weapon and no apparent plan to immediately carry out Chispo's order. No record evidence suggests that Lugo had been in contact with Cirilo that morning, or at any other time, with regard to any plan to kill Mejias.

After Officer Mejias arrived, and after Lugo saw the officer in his car checking the cylinder of his pistol, and after the officer became embroiled in an argument with another member of the El Ideal drug crowd, and after the whole group hurried over to watch that confrontation, *then* Lugo called Ramirez and told him to bring "the gun" so he could kill the officer. Lugo, who was using cocaine heavily, moved with others in his group to a house across the street from the "drug point," and Mejias joined them there. When Ramirez arrived, Lugo made no immediate effort to get the gun from the car. Instead, trying to instigate a fight, Lugo argued with Mejias about his suspicion that Mejias was an undercover agent.

Shortly after the argument with Mejias, Lugo retrieved the pistol from Ramirez's car, but kept it hidden in his pants, covered by

---

**33.** Lugo testified under oath that his original story that Cirilo owed Chispo money was a lie because actually he, Lugo, not Cirilo, owed the debt. Later, Lugo said that although his first story was partially a lie, Cirilo also owed Chispo a debt.

his shirt. Lugo then tried unsuccessfully to incite a group hanging around El Ideal, including Mangual and Cirilo, to beat up the officer. Lugo did not show his gun to the group, even though they declined his exhortation to beat up Mejias. Lugo returned to the house and forced Mejias at gun point to give Mangual the keys to his car, so the car could be searched and Mejias's weapon removed.[34] Lugo testified that Cirilo was in El Ideal when he made these arrangements with Mangual and that Cirilo did not know what was going on, except for Lugo's earlier suggestion that they beat up the officer.

While Mangual and others searched the car for Mejias's gun, Cirilo came out of El Ideal and stood close by, touching the car, but did not participate in the search. Lugo watched the car and the search activity from the house across the street, holding Officer Mejias captive at gun point. Lugo decided the group had found and removed Mejias's gun because they moved away from the car. Lugo testified, "I waited and then I saw when they approached the—the—white Suzuki, and I waited for them to get away from it. When they—when they—I saw that they had gotten away from it a bit, I—realized that they had found the weapon, the firearm. [Q. Okay.] I told Officer Ivan Mejias to get up and to walk slowly in front of me, to remember that I was armed and not to try to do anything."

Lugo then escorted Mejias back to the car, with the gun still hidden, and told him to get into the car (the *driver's seat*); the keys were given to him, and Lugo told him "not to

come around anymore." Mejias turned on the ignition.

As Officer Mejias was about to drive away, another young man ("Papilin") "came over" or "came out" to tell Lugo, in essence, that he had to kill the officer rather than let him go. At that point, Lugo's plan seemed to change again. Lugo "signalled," "using his hands in a cupped fashion as is used to say 'come'" and "called" to Mangual, who was on the other side of the car, to come over. The officer was now forced out of the driver's seat and into the back seat with Lugo, while Mangual replaced him behind the wheel. Lugo testified that as they left, "Tony [Ramirez] and Nesty [Cirilo] were at the El Ideal Cafetin—or Cafetin Ideal." The car pulled into the street and shortly after leaving El Ideal (the elapsed time was probably just a few minutes, but the record is unclear), Lugo deliberately shot the officer twice. Mangual asked Lugo, "What did you do?" and Lugo answered, "Keep driving or you're next." The noise and shock from the shots inside the car caused Mangual to lose control and drive the car off the road, suggesting that he had not expected the shooting. After they were again underway, one of Chispo's men from the drug point drove by on a motorcycle and asked what had happened (no doubt attempting to determine whether Lugo had carried out Chispo's standing order). Lugo signalled that he killed the officer.

Even if Cirilo and Ramirez followed *immediately* behind in Ramirez's car (which is only suggested by FBI Agent Pages' summary of Mangual's pretrial statement to him, which in turn is directly contradicted by Lugo's testimony[35]), there is simply no evi-

---

34. Ramirez, "Junito," and David Silva were present when Lugo and Mangual took the officer's keys. According to Lugo, Cirilo was in El Ideal. · When Lugo brought the officer back to his car, after it was searched, apparently with Lugo's pistol still hidden, Lugo told him to walk in front of him and to remember that he was armed. Lugo testified that he was inside Mejias's car before he pulled out his pistol. Thus, the circumstances support an inference that Mangual, "Junito," and David Silva, as well as Ramirez, all knew that Lugo had a gun. The majority's opinion might suggest that Cirilo was in the group with Mangual and Lugo when they planned to take Mejias's keys at gunpoint. Although the record is somewhat confusing on this point, the only fair reading shows that Cirilo was

in El Ideal at that time, not in the group with Mejias.

35. Lugo testified without contradiction that he had no plan for Cirilo to follow him; that Cirilo was not aware that he was going to kill the officer, even when they left El Ideal; that Cirilo and Ramirez were inside El Ideal when Lugo and Mangual abducted Mejias in Mejias's car; and, that he had no idea how Cirilo and Ramirez happened to come looking for him in Ramirez's car. Lugo also testified without contradiction that the first time he noticed them in the black Oldsmobile, Cirilo and Ramirez were driving *toward* Lugo and Mangual, *after* the officer had been shot, and *after* Mangual had recovered control of Mejias's car.

dence supporting the inference that Lugo planned ahead of time to have a getaway car follow them. Lugo, the shooter, testified that there was no such plan. Furthermore, Lugo's obvious last minute change of mind (to kill rather than scare Mejias away) shows how implausible it is to draw an inference that Lugo planned to have a getaway car driven by Cirilo follow him for use after the murder. The majority seems to agree that Lugo was sending the officer away unharmed until Papilin intervened. Cirilo and Ramirez, then, had to have decided to follow the Mejias car on the spur of the moment. If any plausible inference is to be drawn from the fact that Ramirez and Cirilo followed the Mejias car, whenever they left (again, the record is confusing), it would be that Cirilo and Ramirez wanted to watch the action. But the evidence does not support an inference that Cirilo knew about and joined with and assisted Lugo's plan to murder Mejias. Absent evidence of a prearranged plan, there is simply no evidence, direct or circumstantial, that Cirilo *intended* to assist Lugo in murdering Mejias. Following along, like mere presence, is simply not enough in my view. Thus, evidence of specific intent, an essential element of the charged offense, is completely lacking.

To the extent that the "network" depends in part on an inference that Chispo might have ordered *Cirilo*, as well as Lugo, to kill the officer, as the majority seems to suggest, I find such an inference completely implausible and entirely unsupported by anything but speculation. In addition, even if Cirilo did have independent orders to kill from Chispo, there is nothing in the record to suggest that Cirilo knew of *Lugo's* orders and plans, or that he intended to assist Lugo.

I also find no plausible inference of joint action or plan in the fact that Cirilo appeared at El Ideal ten or fifteen minutes after Ramirez arrived, since no evidence in the record purports to link their arrival times, and it is undisputed that Cirilo spent many hours at El Ideal *every* day, along with the usual cast of drug characters. No evidence of record suggests that Cirilo's arrival time was any different than usual on November 1, when the officer was shot.

We all agree that "mere presence" at the scene of criminal activity, even in conjunction with knowledge of the activity, is legally insufficient to prove a defendant guilty of aiding and abetting a crime. *See United States v. Guerrero*, 114 F.3d 332, 342 (1st Cir.), *cert. denied sub nom., Pilco v. United States*, —— U.S. ——, 118 S.Ct. 184, 139 L.Ed.2d 124 and *Rivas v. United States*, —— U.S. ——, 118 S.Ct. 320, 139 L.Ed.2d 248 (1997). Nevertheless, to support their inferential theory of guilt, the majority points to the familiar adage that criminals do not ordinarily welcome innocents as witnesses to their criminal activities. *See, e.g., Montilla–Rivera*, 115 F.3d at 1064. My colleagues invoke the adage to show that Cirilo must have known that Lugo was planning to murder Officer Mejias, or his mere presence would not have been tolerated.

In my view that adage is not particularly helpful in understanding this case. Cirilo was *not* present when Lugo shot and killed Officer Mejias; Lugo told *Ramirez* to get the pistol from Ramirez's car when Cirilo was *not* present; and Lugo made arrangements with *Mangual* to get the pistol from Mejias's car, when Cirilo was *not* present.[36] According to Lugo, Cirilo was also *not* present when

---

Agent Pages testified about Mangual's statement to him. Describing the events as Mangual, Lugo, and Officer Mejias were about to leave El Ideal, Pages testified: "They close the doors. Just about that time—okay. Just—about that time Mangual Corchado stated that others were following them in a black Oldsmobile two-door." Pages also testified that when the shots were fired, Mangual became disoriented and lost control of the car. According to Pages, Mangual looked back and asked Lugo "What did you do?" Lugo responded, "keep driving or you're next." Mangual stopped the car; Lugo moved from the back seat to the front seat where Mangual saw

the gun; and then they again started on their way. During that time, there is no mention of Cirilo or Ramirez or the black Oldsmobile. The next time Pages said Mangual saw the black Oldsmobile was much later, when it followed them into the cemetery and stopped behind them.

**36.** The evidence also shows that Lugo kept his own gun hidden when Cirilo might have seen it—the majority's inference that Cirilo had "a clear view" of the gun is not supported by the record.

he and Mangual abducted Mejias and drove off in the Suzuki. (In fact, Cirilo was *acquitted* of the carjacking charges against him.) Contrary to the majority's conclusion, the record does not show that Lugo "allowed" Cirilo to observe or participate during any of the critical events preceding the officer's murder. All the record shows is that Cirilo was simply hanging around the El Ideal drug point, as usual, and like the usual suspects.

In addition, the evidence shows that the only criminal activity Cirilo normally observed and participated in with Lugo, Mangual, and the rest of the El Ideal group was drug use and dealing, not murder. The record includes no evidence that Lugo, Mangual, or any of the El Ideal group had previously been involved in murders, or that murder or organized and joint violence was ever part of their routine drug activity. Apparently, neither Lugo nor any of the others were armed when they "worked" at the drug point. Lugo had to phone Ramirez to get a gun, and no one else was armed during any of the events preceding the murder. It strikes me as implausible to infer, based on this record, that because Cirilo willingly and regularly participated in illicit drug activity at El Ideal with the usual characters, he necessarily joined Lugo in murdering Mejias. Thus, while Cirilo's presence at El Ideal was hardly "innocent," since it involved continuing illegal drug dealing and use, his presence alone cannot serve to establish that he knowingly associated with Lugo on November 1 for the purpose of, and actually assisted Lugo in murdering Mejias. Certainly Cirilo's presence *after* the murder, and his participation in dumping the car and hiding evidence of the crime does not show, and cannot be relied on to establish his foreknowledge and intent to participate *before* the murder. *See, e.g., Andrews,* 75 F.3d at 556 n. 5.

The majority asserts that the jury could have found that Cirilo acquired sufficient knowledge of Lugo's plan to kill during the "riveting" events just before Lugo and Mangual abducted and drove away with Mejias. But Lugo's testimony provides the only actual evidence of Cirilo's whereabouts during the critical moment when Papilin "came over" and told Lugo to kill the officer rather than let him go unharmed. Lugo said he called Mangual (not Cirilo) to come over to drive Mejias's car. Lugo also said that at that point Cirilo was away from Mejias's car—in the area of and then inside El Ideal.

The majority focuses on Lugo's testimony that Cirilo was standing right next to Mejias's car *during the earlier search* for Mejias's weapon—inferring that Cirilo must have heard Papilin's directive and thus knew Lugo was about to murder Mejias. Overlooking Lugo's testimony that the group *moved away from the car after the successful search* and before Lugo brought Mejias back to his car, and that Cirilo had moved to the area of El Ideal and then into El Ideal before Lugo departed with Mejias, the majority speculates that Cirilo, unlike the others, did *not* move away. Indeed, the majority postulates that Cirilo stayed right next to Mejias's car and heard and understood the significance of Papilin's instructions to Lugo, which caused an abrupt change in Lugo's plan to let Mejias drive away.

The record does not support that view at all. Even Mangual, who *was* on the other side of the car, and who responded to Lugo's signal and calling of his name, apparently did not see or hear Papilin's instructions.[37] And, notwithstanding the statement in the majority opinion, I cannot find anything in the record that supports the notion that Lugo "announced" his intention to kill Mejias at that time, or at any time. Lugo just shot Mejias, surprising even Mangual, the driver. The majority's inference that Cirilo was close enough to hear Papilin's instruction and

---

**37.** Mangual's version of these events, related through the testimony of Agent Pages, did not include Lugo's last minute change of plans instigated by Papilin. Instead, Mangual described Lugo bringing Officer Mejias to the car, immediately putting him into the back seat, and ordering Mangual to drive. Mangual's version suggests that he, who was indeed close by, on the other side of the car, never saw or heard Papilin approach Lugo to tell him that he had to kill the officer rather than let him go. If *Mangual* was unaware of the change of plans and Papilin's remarks, as his version of events demonstrates, it is an even more difficult stretch to speculate that Cirilo, who by all the evidence was in the area of or in the El Ideal market, might have heard and understood the exchange.

therefore knew of Lugo's plan to kill the officer is just speculation, and speculation that is contradicted rather than supported by the record evidence. But even if all of the majority's speculation is accepted, there is no evidence that Cirilo *then joined in and helped* Lugo to carry out his abruptly formed murder plan, rather than just followed along to see what would happen.

I also cannot accept as plausible the majority's inference that Lugo must have planned to have Ramirez follow in the Oldsmobile in order to have a getaway car after the murder, and that Cirilo must have been the previously arranged getaway driver, given Ramirez's lack of driving experience. As the record evidence abundantly shows, Lugo did not have a cohesive plan regarding whether, when, or how he would murder Officer Mejias. Lugo also did not plan, ahead of time, where he would shoot Mejias, or how he would dispose of the body. Lugo's uncontradicted testimony shows that he thought up the plan to dump the car and body into the quarry as he and Mangual drove along, *after* he shot Mejias. Thus, the evidence does not support the notion that Lugo actually anticipated his need for a getaway car, much less that Cirilo agreed in advance to provide it in an effort to facilitate a murder. As noted earlier, Lugo testified, again without contradiction, that he did not ask for Cirilo's help.

### Beyond a Reasonable Doubt

To support a guilty verdict, the record evidence, properly assessed, must permit a rational jury to find each element of the crime beyond a reasonable doubt. *See, e.g., United States v. Houlihan,* 92 F.3d 1271, 1295 (1st Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997); *Spinney,* 65 F.3d at 235. Association with criminals, involvement in unrelated criminal activity, presence at the scene, and assistance after the fact, simply do not provide the necessary proof of the elements of aiding and abetting. *See, e.g., Andrews,* 75 F.3d at 556 (defendant's "mere accompaniment," agreement to "get" the victim, and presence during the shooting insufficient to show his intent to aid and abet in the shooting); *de la Cruz–Paulino,* 61 F.3d at 998–1002 (defen-

dant's presence and assistance in drug sale was in menial role rather than as "knowing participant" and comment to undercover agent to "watch out" for the police in the area at best demonstrates last minute knowledge insufficient for criminal intent); *Salamanca,* 990 F.2d at 640 (watching brother bludgeon officer and then helping him escape insufficient to establish intent for aiding and abetting).

In my view, the majority strives mightily but constructs only a thin chain of implausible inferences. But even if the majority's inferences were plausible, the inferential chain would still have to be strong enough to establish each element of aiding and abetting murder *beyond a reasonable doubt* in order to support Cirilo's conviction, and it is not. *See United States v. Luciano–Mosquera,* 63 F.3d 1142, 1152 (1st Cir.1995), *cert. denied,* 517 U.S. 1234, 116 S.Ct. 1879, 135 L.Ed.2d 174 (1996). "Some evidence" or a "mere modicum" of evidence is not sufficient to satisfy the reasonable doubt standard. *Jackson,* 443 U.S. at 320, 99 S.Ct. at 2789–90. A weak inferential chain that is contrary to uncontradicted testimony cannot, as a matter of law, support a finding of guilt beyond a reasonable doubt. *See Houlihan,* 92 F.3d at 1295. It must also be remembered that a jury verdict supported by some evidence does not automatically meet the constitutional requirement that the proof be sufficient, as a *legal* matter, to establish every element of the charged crime beyond a reasonable doubt. *Compare United States v. Feinberg,* 140 F.2d 592 (2d Cir.1944) (Hand, J.) *with Curley v. United States,* 160 F.2d 229 (D.C.Cir.1947). *See also United States v. Taylor,* 464 F.2d 240 (2d Cir.1972). The reviewing court is constitutionally obligated to assess the evidence, notwithstanding a jury's guilty verdict, to determine whether the evidence *can,* legally, establish every element beyond a reasonable doubt. That "some" evidence pertinent to establishing each essential element of the charged crime can be gleaned from the record, and a particular jury returned a guilty verdict, does not necessarily establish the legal sufficiency of the evidence.

Assessed by another measure, if the inferential evidence, taken as a whole, would be equally consistent with theories of both guilt and innocence, as it is here, a rational jury must have a reasonable doubt about the defendant's guilt. *See United States v. Flores–Rivera*, 56 F.3d 319, 323 (1st Cir.1995); *accord Guerrero*, 114 F.3d at 344. In my view, even if the majority's inferences were plausible (and they are not), the best that could be said is that the inferential evidence is equally consistent with theories of guilt and innocence: (1) Cirilo knew ahead of time that Lugo planned to kill Officer Mejias and followed with Ramirez in the Oldsmobile *intending* to assist in the murder plan by providing the getaway car after the murder; and (2) Cirilo knew ahead of time that Lugo planned to kill Officer Mejias and followed with Ramirez in the Oldsmobile not as a joint venturer but only to see what would happen, as the El Ideal group had eagerly watched Mejias's earlier confrontation with one of the group (Navarro). Because the majority's inferential picture is merely equally consistent with theories of guilt and innocence, their evidentiary "network" is legally insufficient to permit a rational jury to find, beyond a reasonable doubt, that Cirilo *intended* to *help* Lugo kill Officer Mejias, and actually associated with Lugo to accomplish that purpose, *before* Lugo shot Mejias.

To my mind, under any meaningful legal concept of reasonable doubt, the record evidence in this case is insufficient to show that Cirilo knew about Lugo's intent to murder in advance of the killing, and intentionally assisted in carrying out that murder. Failure of proof should make this an easy legal decision, though setting Cirilo free, given the failure to properly charge him, is as difficult for a judge as it no doubt was for the jury. *See* Jon O. Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U.L.Rev. 979, 989 (1993); *see also Salamanca*, 990 F.2d at 640. In dissenting, however, I am reminded of Judge Easterbrook's comment on the propriety of reversing convictions based on insufficient evidence:

Nothing we do as judges in criminal cases is more important than assuring that the innocent go free. Few innocent persons reach us: prosecutor, grand jury, trial judge, and petit jury have sifted the pool of suspects. Some of the defendants who come here are innocent, but usually we can't tell which. False accusations of crime must be caught by prosecutor and petit jury; we cannot reverse a conviction just because the main witnesses may have been confused or, worse, liars. Now and again, however, a case arrives in which something transparently has gone wrong, and we must act. Every time we reverse a conviction on account of insufficient evidence, we avert many more; the standard of review in this court establishes the benchmark that guides conduct elsewhere.

*United States v. de Ortiz*, 883 F.2d 515, 524 (7th Cir.1989) (Easterbrook, J. concurring); *rehearing granted; judgment vacated*, 897 F.2d 220 (7th Cir.1990); *decision after rehearing* 907 F.2d 629 (7th Cir.1990) (Easterbrook, J.). Something transparently has gone wrong in this case in my view. Although Cirilo is no moral innocent, the evidence in this record is no more legally sufficient to prove aiding and abetting murder than it was to prove aiding and abetting carjacking.

I would reverse Cirilo's aiding and abetting conviction because I believe the law requires that result.